UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES HENRI HANS BUSSE,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 19-cv-2427 |

## COMPLAINT

### PRELIMINARY STATEMENT

1. James Henri Hans Busse ("Plaintiff") is a United States citizen. Notwithstanding that objectively verifiable fact, in 2017, officers of the U.S. Department of Homeland Security ("DHS") unlawfully, and without adequate cause, arrested Plaintiff on immigration charges and detained him for removal proceedings.

2. Prior to, during, and after his arrest, Plaintiff repeatedly told DHS officers that he is a U.S. citizen and provided specific verifiable facts sufficient to support that claim. DHS officers ignored Plaintiff and, during the eight months between his initial contact with DHS and his arrest, failed to take any meaningful steps to verify his citizenship or even request readily available proof of citizenship from him.

3. As a result of DHS's actions and inactions, Plaintiff was unlawfully deprived of his liberty and subjected to a humiliating arrest during which he was escorted in handcuffs and shackles through John F. Kennedy International Airport ("JFK Airport").

4. Plaintiff was then detained by DHS for sixty-eight days at Bergen County Jail, causing him severe mental anguish, including suicidal ideation.

1

5. Even after being presented with proof of his citizenship, DHS continued to prosecute Plaintiff, extending his unlawful detention and causing Plaintiff continued and unnecessary anxiety.

6. Plaintiff suffered, and continues to suffer, serious emotional distress stemming from his illegal arrest, detention, and prosecution.

7. Plaintiff brings this action under the Federal Tort Claims Act ("FTCA").

## JURISDICTION AND VENUE

8. Jurisdiction of this Court arises under 28 U.S.C. §§ 1331 (federal question) and 1346(b)(1) (United States as federal defendant).

9. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(e) and 1402(b) because Plaintiff resides in the Eastern District of New York and a substantial part of the acts and omissions giving rise to these claims occurred in the Eastern District of New York.

## EXHAUSTION OF REMEDIES

10. On March 29, 2018, Plaintiff submitted an Administrative Tort Claim to DHS, and to DHS components Customs and Border Protection ("CBP") and Immigration and Customs Enforcement ("ICE"). The agencies denied Plaintiff's administrative claim on October 29, 2018. Plaintiff has therefore exhausted all available administrative remedies and timely files this Complaint within six months of that denial pursuant to 28 U.S.C. §§ 2401(b) and 2675(a).

## PARTIES

11. Plaintiff, a 37-year-old U.S. citizen is, and was at all times relevant to this Complaint, a natural person residing in Brooklyn, New York.

2

12. Defendant United States of America is the appropriate defendant for claims brought under the FTCA. 28 U.S.C. § 1346(b)(1).

13. At all times relevant to this Complaint, DHS employees were acting as investigative or law enforcement officers, and in the scope and course of their employment with DHS.

## FACTUAL ALLEGATIONS

*Plaintiff's United States Citizenship*

14. Plaintiff was born in Barbados in 1981 to an unmarried couple, Yvette Ingrid Cooper and Henri Joseph Gerard Busse. At the time, Plaintiff's mother was a lawful permanent resident ("LPR") of the United States, and Plaintiff's father was a Canadian national with no known lawful status in the United States.

15. On September 11, 1981, at six weeks old, Plaintiff entered the United States legally as an LPR with his mother, Yvette.

16. On January 22, 1991, when Plaintiff was nine years old and living in the United States, Plaintiff's mother became a naturalized U.S. citizen.

17. By operation of law, Plaintiff automatically became a citizen on February 25, 1995, the day his father died.

18. In determining whether an individual derived citizenship, the controlling law is the law in effect when the last material condition is met. Under former Immigration and Nationality Act ("INA") § 321(a), 8 U.S.C. § 1432(a), which was in effect on February 25, 1995, a child automatically derives U.S. citizenship when, prior to his eighteenth birthday, one parent naturalizes, one parent dies, and the child is living in the United States as an LPR. No application or filing of any kind is required to confer citizenship under this statute.

19. Plaintiff became a U.S. citizen on February 25, 1995 upon the death of his father because Plaintiff was an LPR, his mother had already naturalized, he was under the age of eighteen, and living in the United States. *See former* INA § 321(a); 8 U.S.C. § 1432(a).

20. On March 12, 2012 and on April 27, 2013, DHS officials acknowledged and noted Plaintiff's apparent U.S. citizenship during two previous entrances into the United States.

*Procedures for Verification of United States Citizenship*

21. It is illegal for the federal government to exert its civil immigration enforcement authority against U.S. citizens. 18 U.S.C. § 4001(a).

22. Notwithstanding this limit on DHS's authority, and internal protocols and procedures directing immigration officials to make a thorough investigation into any claims to U.S. citizenship, DHS arrests hundreds of U.S. citizens every year, including individuals in the New York area.

23. A 2015 ICE Policy Memorandum, which upon information and belief was in effect at the time of Plaintiff's arrest and unlawful detention, makes clear that investigation into an individual's citizenship should automatically commence upon certain indicia of potential U.S. citizenship. One such triggering factor is where "[t]he individual entered the United States as a lawful permanent resident when he or she was a minor and has at least one parent who is a U.S. citizen." *See* U.S. Immigration and Customs Enforcement, Policy No. 16001.2, *Superseding Guidance on Reporting and Investigating Claims* (Nov. 10, 2015) ("2015 ICE Memo").

24. Such an investigation is also supposed to be automatically triggered when officials are presented with an affirmative claim to U.S. citizenship. *Id.*

4

25. Following indicia of and/or claims to U.S. citizenship, officials are required to follow strict protocol under the 2015 ICE Memo, including: a thorough factual examination; swift preparation and submission of a memorandum assessing citizenship to the Headquarters Office of the Principal Legal Advisor Immigration Law and Practice Division; and prompt review of the memorandum by Headquarters for a final determination. *Id.*

26. Where there is credible or even just "[s]ome probative evidence" of U.S. citizenship, officials are instructed not to arrest the individual or, if already in custody, to "immediately release[]" the individual. *Id.*

*Defendant's Referral of Plaintiff to Deferred Inspection*

27. On November 3, 2016, Plaintiff flew to Barbados for a brief vacation. On November 30, 2016, Plaintiff returned to the United States through JFK Airport in Jamaica, Queens.

28. Upon arrival, Plaintiff was held by DHS officers for hours for secondary inspection, during which time officers generally conduct additional investigation to verify an individual's immigration or citizenship status and admissibility into the United States. At some point during secondary inspection, DHS officers handcuffed Plaintiff to a chair.

29. During this hours-long period, Plaintiff asserted that he was a U.S. citizen. A DHS officer asked Plaintiff for contact information for Plaintiff's family members, which Plaintiff provided. Plaintiff informed the DHS officer that his mother was a U.S. citizen, and that his father had passed away years ago, when Plaintiff was a child. On information and belief, DHS officers never attempted to contact Plaintiff's family members, nor did they make any adequate attempt to confirm his mother's citizenship or his father's death.

5

30. Eventually, a DHS officer told Plaintiff he was free to go, but that Plaintiff had to return to JFK Airport to meet with a designated DHS officer. He did, however, receive an "Admitted" stamp in his passport dated November 30, 2016.

31. Plaintiff was scheduled to return to JFK Airport for an appointment with a DHS officer on January 30, 2017.

32. DHS had a responsibility to investigate and verify Plaintiff's claims to U.S. citizenship following his release from JFK. In fact, on January 30, 2017, a DHS officer noted on Plaintiff's Order to Appear at JFK that "subject inspection is being deferred for review of A file to determine USC derivation."

33. However, upon information and belief, DHS failed to take the most basic steps necessary to verify or even provide Plaintiff with an opportunity to confirm his U.S. citizenship during the eight months between his initial contact with DHS and his arrest by DHS.

34. Not only did DHS fail to verify or allow Plaintiff to confirm his citizenship claim, but his assigned contact, Officer Vanessa Jurado, gave Plaintiff false assurances that she was trying to help him "clear up" confusion about his immigration status, when in fact, she was building the deportation case against him based on the false and unsupported assumption that he was not a U.S. citizen.

35. After Plaintiff's release from JFK Airport, Plaintiff kept in regular contact—both in person and by phone—with Officer Jurado. On multiple occasions, Officer Jurado blatantly disregarded Plaintiff's statements that he was a U.S. citizen, and that while he was a minor, his mother had naturalized and his father had passed away. On information and belief, Officer Jurado failed to take the minimal steps needed to confirm Plaintiff's U.S. citizenship, and failed to provide Plaintiff with the opportunity to confirm his claim.

36. Upon information and belief, DHS had documents in its possession demonstrating all but one of the factors supporting Plaintiff's claim to citizenship and was on notice as to the final factor—that Plaintiff's father had died when he was a child. During the eight-month period of regular contact, when Officer Jurado regularly requested that Plaintiff gather and deliver documents irrelevant to his citizenship, she never asked Plaintiff for proof of his father's death, which Plaintiff could have obtained with minimal effort. On information and belief, Officer Jurado also did not seek out these documents on her own. Plaintiff dutifully relied upon Officer Jurado's expertise and directions. Plaintiff collected all requested documents trusting that Officer Jurado was assisting him to clear up the immigration issue.

37. Instead, Officer Jurado focused her investigation completely on Plaintiff's misdemeanor criminal history. Criminal history has no bearing at all on the admission of U.S. citizens into the United States. Officer Jurado requested that Plaintiff bring certificates of disposition and documents related to his past misdemeanor criminal convictions, and on multiple occasions, Plaintiff made trips to Officer Jurado's office at JFK Airport to deliver the documents she requested.

38. Upon information and belief, Officer Jurado asked Plaintiff to gather this evidence not to aid Plaintiff in sorting out his citizenship claim, but to support charges of removability based upon the false and unsupported assumption that Plaintiff was not a U.S. citizen.

39. In fact, on February 2, 2017, a DHS official wrote letters to New York criminal courts seeking court documents related to Plaintiff's criminal history and wrongfully describing Plaintiff as being in removal proceedings.

40. For the entirety of the months-long period that Plaintiff complied with Officer Jurado's demands, Plaintiff trusted and relied upon assurances that Officer Jurado was helping him to resolve the issue of his citizenship. Relying on Officer Jurado's assurances and the assumption that she was properly doing her job as an employee of the U.S. government, Plaintiff did not, during this period, seek outside legal assistance with this matter.

*Defendant's Unlawful Detention of Plaintiff*

41. On July 27, 2017, Plaintiff again traveled to an appointment with Officer Jurado at JFK Airport to deliver documents that Officer Jurado had requested. Plaintiff believed that he was attending another routine meeting with Officer Jurado. After his arrival, however, several DHS officers detained Plaintiff. Plaintiff protested, asked why he was being detained, and again asserted his U.S. citizenship. Officer Jurado responded that Plaintiff could "explain all of it to a judge."

42. At no point during this arrest and detention did DHS officials show Plaintiff a warrant and, upon information and belief, DHS did not possess a warrant for Plaintiff's arrest.

43. DHS officers shackled Plaintiff around his arms, waist, and feet. DHS officers then led Plaintiff through the arrivals area at JFK Airport. While Plaintiff was being led through the airport, he repeatedly asked why he was being detained. DHS officers ignored Plaintiff's questions. This experience of being paraded through JFK Airport in shackles caused Plaintiff extreme embarrassment and trauma.

44. Given the facts in DHS's possession that showed Plaintiff's likely U.S. citizenship and the fact that Plaintiff repeatedly advised DHS not only of his U.S. citizenship, but the factual basis thereof, DHS lacked probable cause or otherwise adequate proof—and therefore lacked legal authority—to arrest him on immigration charges.

8

45. DHS officers placed Plaintiff in a van and told him that he would see an immigration judge in eight to ten days. Plaintiff asked why he was being detained and stated that he and his mother were U.S. citizens. The officers did not tell them why he was being detained and did not otherwise respond to his assertions of citizenship.

46. On information and belief, DHS officers brought Plaintiff to a DHS processing facility located in Manhattan, where he was detained for several hours.

47. DHS officers next transferred Plaintiff to Bergen County Jail, in New Jersey, where he arrived the afternoon on July 28, 2017.

48. On July 27, 2017, DHS issued an initial Notice to Appear ("NTA"), the charging document in immigration court. The NTA alleged that Plaintiff was not a citizen or national of the United States, that he was a citizen of Barbados, and that he was inadmissible based on criminal history.

49. On information and belief, DHS officers brought Plaintiff to a different DHS facility on August 21, 2017, where he was served a "superseding" NTA. DHS filed the superseding NTA with the immigration court that same day.

50. During his detention, Plaintiff made pleas to any officer who would listen that he was a U.S. citizen and should not be in detention. Officers either ignored his pleas or expressed their sympathy but took no action.

51. Plaintiff spoke with ICE Deportation Officer Jeff Brandt by phone to ask for updates about his case. Plaintiff told Officer Brandt that both he and his mother were U.S. citizens. Officer Brandt did not respond to Plaintiff's assertions, other than to ask Plaintiff to stop calling him. On information and belief, Officer Brandt did not ask any follow up questions or take any action to verify Plaintiff's citizenship status.

52. During his detention, Plaintiff was confined in unsanitary conditions, not given adequate meals, repeatedly denied access to information about his case, not accurately advised about how long he would be held in detention before being allowed to see a judge, and denied a mechanism to prove his citizenship, causing him severe emotional distress and leading to suicidal ideation. Furthermore, he encountered other individuals who had been detained for long periods of time in DHS custody, leaving him hopeless that he would ever return to his life in the United States.

53. On September 27, 2017, after sixty-two days of unlawful immigration detention, Plaintiff was finally produced to the immigration court at 201 Varick Street in Manhattan for his first hearing before an immigration judge.

54. Plaintiff was unable to hire an attorney. On the day of his initial appearance in court, Plaintiff obtained free legal counsel through the New York Immigrant Family Unity Project ("NYIFUP"), which provides universal representation to detained indigent individuals in removal proceedings.

55. Plaintiff's counsel through NYIFUP, Gregory Copeland of the Legal Aid Society, was able to quickly and easily determine Plaintiff's status as a U.S. citizen during his initial meeting with Plaintiff, after Plaintiff told him that his mother was a U.S. citizen and that his father had died when he was a child.

56. During this initial meeting, Plaintiff made several comments to Mr. Copeland about wanting to harm himself based on his experiences in detention. Despite his knowledge of and assertions to U.S. citizenship, Plaintiff even considered taking a deportation order because he could not bear the prospect of continued extended detention in the deplorable conditions in which he was being held, and he thought that was the only way to ensure

10

his prompt release from custody. Mr. Copeland and his colleague ultimately convinced Mr. Busse to allow them to defend him and litigate his citizenship on an expedited basis.

57. In court, Mr. Copeland immediately alerted the attorney for DHS, Assistant Chief Counsel Sarah Campbell ("ACC Campbell") and the immigration judge as to Plaintiff's U.S. citizenship and the facts giving rise thereto and argued that the immigration court did not have jurisdiction over the case because Plaintiff was a U.S. citizen. The immigration judge directed the parties to communicate regarding this issue.

58. On information and belief, instead of cooperating with Plaintiff's counsel to confirm Plaintiff's citizenship, ACC Campbell obstructed the fair adjudication of Plaintiff's case by refusing to provide key documents in DHS's possession to Mr. Copeland including, but not limited to Plaintiff's birth certificate and his mother's naturalization certificate.

59. Overnight, and with minimal investigation, Mr. Copeland was able to obtain evidence that Plaintiff's father had passed away before Plaintiff turned eighteen, the only element of Plaintiff's citizenship claim not already documented in DHS's own records. On the day after meeting Plaintiff, Mr. Copeland filed a motion to terminate the removal proceedings against Plaintiff, which contained proof of Plaintiff's citizenship—including Plaintiff's mother's passport and proof that Plaintiff's father passed away before Plaintiff turned eighteen. However, notwithstanding DHS's possession of evidence sufficient to substantiate his citizenship, Plaintiff remained detained for four additional days by DHS until he was finally released on October 2, 2017, sixty-eight days after his arrest.

60. After his release from detention, DHS continued to prosecute his removal case. Only after a habeas corpus petition was filed in federal court did DHS concede that Plaintiff is a U.S. citizen. On December 19, 2017, upon a joint motion with DHS, Immigration

11

Judge Gordon-Uruakpa ordered Plaintiff's case terminated with prejudice upon a finding that Plaintiff had carried his burden of proving he was a U.S. citizen.

61. DHS's failures led to the easily preventable arrest, detention, and prosecution of Plaintiff. Before, during, and after Plaintiff's arrest and detention, DHS had in its possession evidence that indicated Plaintiff derived U.S. citizenship, and were made aware of the fact of Plaintiff's father's death during his childhood. DHS ignored Plaintiff's claims and failed to verify or provide him an opportunity to prove these facts. As a result of DHS's actions and inactions, a U.S. citizen who has lived in this country since he was an infant was subjected to an illegal arrest and spent sixty-eight days in jail, bringing him to an emotional brink and causing lasting trauma and distress.

## CAUSES OF ACTION
### Count I
### Federal Tort Claims Act – False Arrest / False Imprisonment

62. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

63. DHS officers intentionally caused Plaintiff to be arrested and detained without probable cause or otherwise adequate proof to believe he was a noncitizen and subject to arrest, detention, and removal.

64. Plaintiff was aware of his arrest and detention and did not consent to it.

65. At all times during Plaintiff's arrest and subsequent detention, DHS officers were aware, or reasonably should have been aware, that they lacked authority to arrest and detain a U.S. citizen under governing laws and policies, and that their conduct was unlawful and not otherwise privileged.

66. As a proximate and reasonably foreseeable result of the actions of DHS officers, Plaintiff suffered injuries including sixty-eight days in detention, pain and suffering, as well as mental, emotional and psychological anguish.

67. The actions of DHS officers constitute the tort of false arrest/false imprisonment under the laws of the State of New York.

68. Under the FTCA, Defendant United States of America is liable for these actions.

## Count II
## Federal Tort Claims Act – Negligent Supervision and Retention

69. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

70. DHS supervisors have a duty to properly train and supervise their subordinates. DHS supervisors were aware, or should have been aware, of their subordinates' propensity to disregard and not follow mandatory internal protocols to verify claims and indicia of citizenship while acting within the scope of their employment.

71. DHS employees involved in all alleged actions lacked proper supervision.

72. DHS owed a duty to Plaintiff but breached its duty by failing to supervise its employees. Plaintiff, a U.S. citizen, was unlawfully arrested and detained, causing him loss of liberty and substantial emotional turmoil as a proximate and reasonably foreseeable result of DHS's failure to supervise its employees.

73. The actions and inactions of DHS supervisors constitute the tort of negligent supervision and retention under the laws of the State of New York.

74. Under the FTCA, Defendant United States of America is liable for these actions.

## Count III
## Federal Tort Claims Act – Malicious Prosecution

75. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

76. DHS officers did not have sufficient probable cause or otherwise adequate proof to prosecute Plaintiff in removal proceedings, as they were on notice that Plaintiff was a U.S. citizen.

77. Even after Plaintiff's claims of U.S. citizenship were presented before an immigration judge, DHS refused to provide key documents in its possession, affirmatively hindering the fair adjudication of Plaintiff's case. In addition, DHS continued removal proceedings against Plaintiff and willfully ignored the additional evidence provided by Plaintiff's attorney, further demonstrating the proceedings were without probable cause or other adequate proof to believe that Plaintiff was a noncitizen in violation of the immigration laws and subject to arrest, detention or removal.

78. Removal proceedings against Plaintiff were terminated with prejudice in his favor on December 19, 2017 upon a finding by the immigration court that the preponderance of credible evidence supported his claim to U.S. citizenship.

79. Without such probable cause or otherwise adequate proof, DHS officers had no proper purpose in prosecuting him, and thus acted maliciously.

80. As a proximate and reasonably foreseeable result of DHS's actions, Plaintiff suffered injuries including unwarranted detention and severe mental and emotional anguish.

81. The actions of DHS officers constitute the tort of malicious prosecution under the laws of the State of New York.

82. Under the FTCA, Defendant United States of America is liable for these actions.

### Count IV
### Federal Tort Claims Act – Negligent Infliction of Emotional Distress

83. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

14

84. DHS officials had a duty to act with reasonable care to not endanger the safety of Plaintiff or to cause Plaintiff to fear for his own safety.

85. Plaintiff's experience of traveling back and forth to JFK Airport in the months leading up to his arrest, his sudden arrest on July 27, 2017, and his experience of being led through JFK Airport in handcuffs and shackles was exhausting, humiliating, and frightening.

86. Further, Plaintiff's confinement in unsanitary conditions, denial of adequate meals, denial of access to information about his case, and denial of a mechanism to prove his citizenship caused him severe emotional distress.

87. As his days in detention compounded and his repeated claims to U.S. citizenship were ignored, Plaintiff was pushed to the brink of mental and emotional collapse, which resulted in suicidal ideation.

88. Plaintiff endured severe mental and emotional distress when DHS officials continued to prosecute him despite being presented with proof of his citizenship.

89. DHS officials breached the duty they owed to Plaintiff and as a proximate and reasonably foreseeable result of DHS's actions, Plaintiff suffered and continues to suffer, severe mental, emotional and psychological trauma and distress.

90. The actions of DHS officials constitute the tort of negligent infliction of emotional distress under the laws of the State of New York.

91. Under the FTCA, Defendant United States of America is liable for these actions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a. Award compensatory damages for Plaintiff's physical and emotional injuries;

b. Award reasonable attorneys' fees and costs; and

15

   c. Grant such other and further relief as may appear just and appropriate.

Dated: April 25, 2019  
      New York, New York

Respectfully submitted,

*(signature)*

Jacqueline Pearce, Esq.  
Peter Markowitz, Esq.  
Jessica Kulig, Legal Intern\*  
Bernardo Caceres, Legal Intern\*  
Immigration Justice Clinic  
Benjamin N. Cardozo School of Law  
55 Fifth Avenue, 11th Floor  
New York, NY 10003  
(212) 790-0213

*Counsel for Plaintiff*

\*Law Student Appearance Form Forthcoming